IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello

Civil Action No.16-cv-02703-CMA-MLC (consolidated for pretrial purposes with Civil Action No. 17-cv-01195-CMA-MLC, Cocona, Inc. v. Columbia Sportswear Company)

COCONA, INC., a Delaware corporation,

        Plaintiff,

v.

VF OUTDOOR, LLC, a Delaware limited liability company,

        Defendant.

---

## ORDER ON CLAIM CONSTRUCTION

---

This patent infringement matter is before the Court on the parties' Joint Motion for Determination of Claim Construction. (Doc. # 149.) As explained below, the Court finds that all three claims are invalid for indefiniteness.

## I.     BACKGROUND

**A.     FACTS**

This case involves U.S. Patent No. 8,945,287. (Doc. # 139-2 (the "'287 patent").) The '287 patent essentially claims a laminate fabric material used primarily in waterproof outdoor apparel. (Doc. # 92 at 2.) Complete right, title, and interest in the '287 patent is assigned to Plaintiff Cocona, Inc. (Doc. # 9 at 2.) Cocona alleges that the commercial activities of Defendants VF Outdoor, LLC and Columbia Sportswear Company are infringing on claims 1, 38, and 39 of the '287 patent. *See* (Doc. # 9 at 3–

9.) The Court begins by briefly summarizing the prior art before turning to the details of the '287 patent.

Waterproof[1] material incorporated into clothing "may seem 'hot and humid' to the wearer because it does not permit moisture vapor to escape from within the garment." (Doc. # 139-2 at 10.) Thus, a need developed for a "breathable membrane (e.g., water-proof membrane) [with] improved moisture transport properties." *Id.* To do so, materials manufacturers can line the interior of, for example, a jacket, with a "microporous" waterproof material typically made of plastic polymer; the microporous layer's holes permit the transmission of water vapor but not liquid water molecules, and a sewed-in mesh liner maintains separation between the microporous layer and the wearer's skin to reduce discomfort. *E.g.*, (Doc. # 167 at 14 (referring to this as "a 2.0" layer product).)

The 2.0 layer design was not without drawbacks, which led to two improvements that require mention because the '287 patent incorporates them both. First, the sewn-in mesh liner was replaced with a "print layer." The print layer is ribbed with microscopic "channels" that maintain separation between the polymer and the wearer's skin to improve heat dissipation, air circulation, ventilation, and water vapor transmission. *See id.* at 9, 14–16 (noting that, within the industry, such technology is generally called a "2.5 layer product"). Second, a layer of "active particles" was added to the waterproof microporous layer that further improves moisture vapor transmission and imbues

---

[1] The specification explains the difference between waterproof and water-resistant membranes: at standard atmospheric pressure, a water-resistant membrane can pass liquids through itself, but waterproof membranes cannot. (Doc. # 139-2 at 10.) A membrane that can withstand a pressure of 1000 mbar without leaking is considered waterproof. *Id.*

materials with additional functionalities. *Id.* at 13. According to the '287 patent's specification, "active particles" are "active" because they "have the capacity to cause chemical reactions" or "physical reactions" "on the surface of the particle." (Doc. # 139-2 at 11.) These active particles are typically carbon-based and activate during a controlled oxidation process that develops the particle's porous structure, which enables the aforementioned reactions. *E.g.*, (Doc. # 139-3 at 67–68.)

Depending on which active particles are used, the material can gain additional qualities such as "odor absorption, moisture management, ultraviolet light protection, chemical protection, bio-hazard protection, fire retardance, anti-bacterial protection, anti-viral protection, anti-fungal protection, anti-microbial protection, and other factors, and combinations thereof." *Id.* As the specification explains, one problem with active particles is that their efficacy decreases over time—an active particle that undergoes a physical or chemical reaction, *e.g.*, to absorb an odor, can lose its ability to absorb odors in the future. *Id.*

The '287 patent attempts to improve upon the active particle membrane by adding a "removable encapsulant" that is designed to "prevent at least a substantial portion of the active particles from being deactivated prior to removal of the removable encapsulant." *Id.* at 10, 12. The removable encapsulant reactivates an active particle to renew its capacity to perform its intended function and prevents active particles from premature deactivation that could occur during the manufacturing process or during shipping. *Id.* at 12. Thus, the '287 patent claims a "water-proof breathable membrane" comprised of a liquid-impermeable base layer and a second layer of "active particles"

that can add various properties to the membrane such as moisture vapor transport capability, odor absorbance, anti-static properties, or stealth properties. (Doc. # 139-2 at 14); *see also* (Doc. # 144 at 3).

**B.    PROCEDURAL HISTORY**

In November 2016, Cocona began this lawsuit against both VF and Columbia. *See* (Docs. ## 1, 9.) The Court later severed the cases against VF and Columbia but partly consolidated them for the sake of efficient pretrial case management. (Doc. # 92 at 2; Doc. # 57 at 6.) Originally, Cocona asserted Claims 25 and 35–37 of the '287 patent. *E.g.*, (Doc. # 86 at 2.) In late 2017, however, VF successfully petitioned the Patent Trials and Appeals Board ("PTAB") of the U.S. Patent and Trademark Office ("USPTO") to institute *inter partes* review ("IPR"). (Doc. # 72.) On May 30, 2019, the PTAB issued a Final Written Decision finding that Claims 27, 28, 30, 32, 33, and 35–37 of the '287 patent are unpatentable. *VF Outdoor, LLC v. Cocona, Inc.*, No. IPR2018-00190, 2019 WL 2306762 (Patent Tr. & App. Bd. May 30, 2019). Both parties cross-appealed the PTAB's findings to the Court of Appeals for the Federal Circuit, which ultimately affirmed. (Doc. # 86 at 2–3.) Since then, Cocona shifted the focus of these cases by asserting new claims from the '287 patent—Claims 1, 37, and 38. (Doc. # 139 at 2; Doc. # 92 at 4.)

As for the instant matter, Defendants filed their Opening Claim Construction Brief, which became ripe on November 8, 2023. *See* (Docs. ## 139, 144, 148–49.) Defendants dispute the meaning of nine claim terms and assert that two claim terms are indefinite enough to invalidate all three asserted claims. *See generally* (Doc. # 139.) On May 20,

2024, the Court held a *Markman* hearing, at which counsel presented a tutorial that briefly explained the technology at issue and advanced the parties' competing claim term constructions. *See generally* (Doc. # 167.) No witnesses testified.

## II.    LEGAL STANDARDS

The fundamental purpose of a patent is to give notice to others of that in which the inventor claims exclusive rights. *Oakley Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1340 (Fed. Cir. 2003). The focus of claim construction is to determine how the words used in a patent would be understood by a "person of ordinary skill in the art"—*i.e.*, a "POSITA"—which requires ascertaining the "ordinary and customary meaning" of the claim terms "in the context of the entire patent." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc); *see also Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1008 (Fed. Cir. 2023). A court has a duty to construe genuinely ambiguous claim terms. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361–62 (Fed. Cir. 2008).[2]

Courts begin with the language of the claims themselves. *Phillips*, 415 F.3d at 1314. General descriptive terms are ordinarily given their full meaning, and modifiers will not be added to broad terms standing alone. *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). Language from independent claims must be construed with dependent claims in mind; the doctrine of "claim differentiation"

---

[2] A court's claim construction order is not necessarily final. "District courts may engage in rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." *E.g.*, *Jack Guttman, Inc. v. KopyKake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002).

creates a rebuttable presumption that, when a dependent claim adds a particular limitation, the independent claim from which the dependent claim derives does not claim said limitation. *E.g.*, *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1378 (Fed. Cir. 2018).

The claim language, however, is not read in a vacuum. It must be considered in light of the other "intrinsic evidence"—the specification and the patent prosecution history—which is "the most significant source of the legally operative meaning of disputed claim language." *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001) (quotation omitted); *Phillips*, 415 F.3d at 1315. "[C]laims must be read in view of the specification" or, more specifically, ***how a POSITA would understand the specification***, because the specification is "the primary basis for construing the claims." *Grace Instrument*, 57 F.4th at 1008 (quoting *Phillips*, 415 F.3d at 1314–15). Generally, neither the specification nor the patent prosecution history can be used to import limitations into the claims. *Phillips*, 415 F.3d at 1323. Two exceptions apply: "(1) 'when a patentee sets out a definition and acts as his own lexicographer' or (2) 'the patentee disavows the full scope of a claim term either in the specification or during prosecution.'" *Lasermarx, Inc. v. Hamskea Archery Sols. LLC*, Civ. No. 22-cv-01956-NYW-KAS, 2024 WL 1239940, at *5 (Mar. 22, 2024) (citing *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)).

Finally, courts may rely on dictionary definitions "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the

patent documents." *Phillips*, 415 F.3d at 1317, 1322–23 (citation and internal quotations omitted).

### III.   POSITA, DEFINED

The POSITA must be defined before claims can be construed because claims construction turns on a POSITA's perspective. *E.g.*, *Lasermarx*, 2024 WL 1239940, at *6 (collecting cases). A POSITA's "ordinary skill in the art" is "the level of technical knowledge, experience, and expertise possessed by a typical engineer, scientist, designer, etc. in a technology that is relevant to the invention. *Id.* (citation omitted). Both parties agree that a POSITA in this case would have:

> an advanced degree (Master's or Ph.D.) or a bachelor of science degree in a relevant field combined with practical experience in one of the following areas: (1) chemical materials, including polymers and materials that undergo sorption science; (2) light and its interaction with matter; and (3) waterproof, breathable materials and garments. Four-year college degrees in Chemistry, Chemical Engineering, Polymer Chemistry, or Physics would be appropriate, or, at a minimum, the completion of courses in chemistry, organic chemistry, physical chemistry, polymer science, or proto-physical chemistry, along with more practical experience in the above technical areas. '

*E.g.*, (Doc. # 144 at 5 (citing (Doc. # 139-11).)

### IV.   INDEFINITENESS

Defendants assert that nine claim terms require construction and that two claim terms are indefinite. (Doc. # 139 at 5–10.) The Court begins with indefiniteness because that issue is dispositive—if Defendants are correct, there would be no need to construe the nine contested claims.

1.     Applicable Law

35 U.S.C. § 112's definiteness requirement conditions a patent's validity on whether its claim terms provide "objective boundaries" for a POSITA. *E.g.*, *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014). The applicable legal standard: a patent is invalid for indefiniteness if its claims—when read in light of the specification and prosecution history—fail to inform a POSITA about the scope of the invention "with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

"[R]easonable certainty" does not require mathematical precision. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017). Objective boundaries "need not be *in haec verba* but may be inferred from ***clear*** limiting descriptions of the invention" because, again, definiteness depends on what a POSITA would understand, and a POSITA is capable of drawing inferences. *See Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) (emphasis added); *see also Grace Instrument*, 57 F.4th at 1008–10. However, a POSITA's inferences can only go so far. A claim term can be indefinite if its scope depends on a testing method where multiple valid testing methods exist that can produce different results and the intrinsic record provides insufficient guidance on which method a POSITA should use if seeking to practice the patent. *See, e.g.*, *Dow Chem. Co. v. Nova Chems. Corp.*, 803 F.3d 620, 634–35 (Fed. Cir. 2015).

2.    <u>Analysis</u>

Defendants contend that the asserted claims are indefinite for two reasons. First, given that the claimed "water-proof breathable membrane" must have "at least one removable encapsulant in an amount effective to prevent at least a substantial portion of the plurality of active particles from being deactivated prior to removal of the removable encapsulant," Defendants argue that "effective" and "substantial" are terms of degree for which the specification fails to provide sufficient context. (Doc. # 139-2 at 14; Doc. # 139 at 5–7.) Second, mindful that the claimed membrane must "comprise[ ] a moisture vapor transmission rate [MVTR] from about 600 g/m$^2$/day to about 11000 g/m$^2$/day," Defendants assert that the specification offers no guidance on which of the multiple recognized MVTR testing methods must be used to determine whether a material falls within the claimed MVTR range. (Doc. # 139-2 at 14; Doc. # 139 at 7–10.)

As explained below, the Court agrees with Defendants' second argument—the MVTR claim limitation is indefinite—which obviates the need to consider Defendants' terms-of-degree argument or construe the contested claims.

a.    *Background Context*

The moisture vapor transmission rate ("MVTR") is "the rate at which moisture permeates a [material], generally measured in grams per square meter per day (g/m$^2$/day)." (Doc. # 139-2 at 13–14.) The specification provides a (non-exhaustive) list of recognized testing methods designed to test MVTR through a barrier film or sheet,

which includes "the Mocan method"[3] and the ASTM's E96 "Water method," also known as the "gravimetric or cup test method." (Doc. # 139-2 at 14; Doc. # 148-3 at 4.) Performing the ASTM E96 Water method test requires controlling for at least two variables: the proximity of liquid water to the test subject material and the air conditions of the test chamber. As for the first variable, water can be placed in direct contact with the material (the "inverted cup" method) or, by placing the material between a water source and a desiccant, water will evaporate as the desiccant draws the vapor through the material (the "upright cup" method). *See, e.g.*, (Doc. # 148-3 at 4–5.) As for the test chamber's air conditions, the ASTM E96 protocol requires controlling for temperature and humidity. (Doc. # 139-11 at 44.)

The ASTM—the organization that established exemplary E96 test conditions—warns POSITAs that MVTR test conditions must be perfectly replicated to ensure any semblance of reliability. (Doc. # 139-11 at 44 (The "value obtained under one set of test conditions may not indicate the value under a different set of conditions").)[4] Yet the Court observes that the specification provides limited guidance on how to structure the

---

[3] According to the parties' experts, "Mocan" is a typographical error likely intended to reference "Mocon" testing machinery, which can also test for MVTR. (Doc. # 144-17 at 14); *see generally* (Doc. # 144-7 at 2) (advertising MOCON equipment).

[4] Indefiniteness can become a mixed question of law and fact insofar as the holding relies on factual findings, in which case the challenger must produce clear and convincing evidence proving those facts true. *Cox Commc'ns, Inc. v. Sprint Commc'n Co.*, 838 F.3d 1224, 1228 (Fed. Cir. 2016) (citation omitted). The underlying fact on which the Court relies—the ASTM's E96 standardized testing protocol—comes from the written protocol published by the ASTM on its corporate letterhead. Neither party questions the document's authenticity. The Court therefore considers the facts contained therein as established by clear and convincing evidence.

MVTR test conditions.[5] Moreover, although the specification includes a data table that conveys MVTR values taken from one set of exemplary test conditions, the table provides MVTR values from both the upward cup method and inverted cup method without explaining what would fall within the claimed range. *Id.* at 11; *see* (Doc. # 139-2 at 6 (publishing inverted cup MVTR results that are seven times higher than upright cup MVTR results).)[6] Put differently, neither the specification nor Figure 2's table explains whether the MVTR range claimed by the asserted claims refers to MVTR values obtained from the upward cup method, inverted cup method, or both.

Defendants' expert, Dr. Abigail Oelker, views the specification's lack of guidance on the bounds of the claimed MVTR range as a significant problem. She opines via written declaration that a POSITA would not be able to know (with reasonable certainty) whether a prototype material infringes the '287 patent because the specification offers insufficient guidance on how the claimed MVTR range relates to the test conditions. (Doc. # 139-11 at 21–22.) Dr. Oelker emphasizes that the ASTM E96 allows for test chamber temperatures ranging from 23 to 38 degrees Centigrade and relative humidity maintained between 50% and 90%. *Id.* Yet, the '287 patent does not technically require

---

[5] To be sure, the specification offers one set of test conditions that "may be" used, but the specification does not teach a POSITA to stick to those test conditions, and the claim language itself does not condition its claim to MVTR results obtained exclusively under those test conditions. (Doc. # 139-2 at 14 (suggesting but not requiring "40 degrees Centigrade and 20% relative humidity over a 24[-]hour period").)

[6] The disparity can be explained by the differences between the tests. The inverted cup method traps water vapor against the experiment sample's surface whereas, with the upright cup method, water vapor is pulled through the experiment sample by a desiccant. Therefore, the inverted cup method forces much more water through the membrane.

any particular test conditions because the only detail provided involves purely permissive language. *See* (Doc. # 139-11 at 24.)

Cocona's expert, Dr. Stephen McCarthy, disagrees but, as explained below, his disagreement is too conclusory to dissuade this Court from agreeing with Dr. Oelker. In his declaration, he asserts that each method's applicability is self-explanatory to a POSITA because a POSITA would know that the upright cup method can be used only to gauge a material's MVTR when exposed to gaseous water whereas the inverted cup is meant for testing MVTR given direct exposure to liquid water. (Doc. # 144-17 at 14–15.) According to Dr. McCarthy, the specification provides that "the MVTR testing in Example 1 may be 'measured according to Water method of ASTM E96-94 at 40 degrees Centigrade and 20% relative humidity over a 24 hour period.'" *Id.* at 15.

b.    *Analysis*

Beginning with the intrinsic record, as the Court must, the claim language itself recites a range of MVTRs without any details about how that MVTR must be calculated. (Doc. # 139-2 at 14.) The specification offers some detail about how the MVTR is to be calculated but, as explained below, the detail provided is insufficient, which renders the contested claims indefinite. The specification acknowledges several methods of measuring MVTR and mentions both forms of the ASTM E96 test. (Doc. # 139-2 at 13–14.) It then suggests—not requires, but suggests—temperature and humidity variables. *See id.* Neither party identifies anything from the prosecution history that would further clarify what test conditions the claimed MVTR range requires.

Because more clarification is needed, the Court turns next to extrinsic evidence. According to the ASTM, "test conditions should be selected that most closely approach the conditions of use." (Doc. # 139-11 at 44.) Dr. Oelker criticizes the claim language because the '287 patent, in failing to clarify the applicable test conditions, effectively claims a range of MVTR values obtained from any manner of test conditions—so long as they are obtained through any iteration of the ASTM E96 water method. According to Dr. Oelker, a POSITA would not know which of the available tests to use to determine whether a given fabric infringes the '287 patent. *See, e.g.*, (Doc. # 139-11 at 22.)

The Court agrees with Dr. Oelker. Although Dr. McCarthy appears to be correct in that a POSITA would know the upright cup method and inverted cup method are meant to measure MVTR in different circumstances, that response does not resolve Dr. Oelker's criticism because the claimed MVTR ranges do not themselves correspond to any particular test conditions or intended uses. Moreover, Dr. McCarthy's explanation acknowledges the specification's use of permissive language yet ignores the critical conceptual distinction between the suggestive nature of permissive language and the mandatory quality of imperative language and how that would impact a POSITA's understanding. *Cf.* (Doc. # 144-17 at 15.) Instead, his explanation simply identifies what the specification recites—one set of exemplary test conditions—and jumps to the conclusion that a POSITA "would understand the testing conditions . . . as guidance for determining whether a membrane or composition satisfies the MVTR limitation." *Id.*[7]

---

[7] Dr. McCarthy refers to independent claims 1 and 27. *Id.* Although the asserted claims in the instant case are claims 1, 37, and 38, the latter two claims are dependent claims derivative of

That reasoning, however, is quintessentially conclusory—it sheds no light on **why** a POSITA would infer mandatory guidelines from merely permissive language and limit test conditions to the exemplary conditions recited in the specification. Without such details, Dr. McCarthy's declaration is unpersuasive.

In the absence of a compelling explanation, Dr. Oelker's criticism requires resolution, which prompts this Court to address the conceptual vagueness at issue in the '287 patent. To illustrate the Court's perception of the problem, imagine a prototype rain jacket. A POSITA could test that jacket to determine its MVTR using either the upright cup method or the inverted cup method depending on whether the jacket's anticipated use conditions will involve, respectively, water vapor or liquid water. Perhaps the jacket is meant for hiking in rainforest climates where mist hangs thickly in the air and the humidity combined with exertion causes considerable perspiration, or the jacket is to be worn by deep sea fishermen who will inevitably get hit by waves while on a boat's deck during a storm. Both uses would require materially different test conditions—at the very least, the former would require the upright cup configuration whereas the latter would require use of the inverted cup method. Yet, the '287 patent does not limit its MVTR range to any particular test or any particular conditions and therefore, by extension, it does not limit the claimed MVTR range to any particular use. Without guidelines on how to structure the E96 test, a POSITA testing a prototype material could inadvertently observe MVTR results that are within the claimed range

---

independent claim 27, so Dr. McCarthy's explanation is technically relevant, albeit unpersuasive.

with respect to liquid water yet beyond the claimed range for water vapor, or *vice versa*. Put differently, a material tested multiple times under different conditions could theoretically fall within the claimed range and outside that same claimed range simultaneously. That degree of ambiguity cannot possibly clarify for a POSITA the scope of '287 patent with reasonable certainty. *See* (Doc. # 139-2 at 6.)

Thus, the Court finds that the MVTR limitation of independent Claim 1 and dependent Claims 37 and 38 are indefinite. Because Claims 1, 37, and 38 all incorporate the aforementioned indefinite language, all three claims are thus invalid.

## V.    THE COURT ORDERS SUPPLEMENTAL BRIEFING

Claims 1, 37, and 38 are not the only claims in the '287 patent that include the MVTR limitation analyzed above. All claims in the '287 patent contain the same MVTR limitation—without any noticeable variation in wording. *See* (Doc. # 139-2 at 14–16.) The same analysis above should therefore ostensibly apply to the entirety of the '287 patent. This leads the Court to consider whether *sua sponte* summary judgment[8] would be appropriate to address the invalidity of the remaining claims.

In the instant case, this Court recognizes that it provided Cocona no notice that *sua sponte* summary judgment on the validity of the entirety of the '287 patent was a

---

[8] A district court is encouraged to provide notice and opportunity to be heard before entering summary judgment *sua sponte*. *See, e.g.*, *Safeway Stores 46 Inc. v. WY Plaza LC*, 65 F.4th 474, 481 (10th Cir. 2023). A district court can forgo formal notice, however, when the party has already "come forward with all of [its] evidence." *Id.* (internal quotation and citation omitted). Further, an appellate court will not reverse for lack of notice in such cases when the lack of notice did not prejudice the losing party. *E.g.*, *Roger v. Riggs*, 71 F.4th 1256, 1263 (10th Cir. 2023). "A party is procedurally prejudiced if it is surprised by the district court's action and that surprise results in the party's failure to present evidence in support of its position." *Id.* (internal citation and quotation omitted).

possibility. However, all of the claims that remain standing after IPR and claims construction contain the exact same MVTR limitation. Moreover, Cocona already knew (from Defendants' opening brief) that this Court was asked to hold as a matter of law that the MVTR limitation is indefinite. Cocona had opportunities to respond both in writing and orally. Ostensibly, Cocona therefore knew from the obvious need to rebut Defendants' indefiniteness argument that it had to advance its best evidence, and Cocona did so in its response brief and at the *Markman* hearing.

Although the Court doubts that Cocona could be prejudiced by *sua sponte* summary judgment on the invalidity of the remaining claims for the same reasons set forth above, the Court will allow both parties an opportunity to file supplemental briefing on the issue of whether this Court can and should extent its legal determination of indefiniteness to the '287 patent's remaining valid claims.[9]

---

[9] To be clear, however, Cocona should not attempt to relitigate the MVTR limitation's indefiniteness in the supplemental briefing. This Court does not appreciate litigants who would rather take a crowbar to a sealed casket than file a notice of appeal.

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that the following claim language from

U.S. Patent No. 8,945,287 is invalid as indefinite: "comprises a moisture vapor

transmission rate from about 600 g/m$^2$/day to about 11000 g/m$^2$/day."

It is FURTHER ORDERED that the parties shall file a supplemental brief as

explained above no later than **<u>September 27, 2024</u>**. Defendants shall have fourteen

calendar days to file a response brief, if they choose to do so.

DATED: September 6, 2024.

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge